UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

1:14CV977

J. BECKWITH

M.J. LITKOVITZ

| | | |
|---|---|---|
| UNITED STATES *ex rel.* | : | |
| McARTHUR, GRUFF & ASSOCIATES | : | CIVIL ACTION NO. _____ |
| LLC, | : | |
| | : | JUDGE _____ |
| BRINGING THIS ACTION ON | : | |
| BEHALF OF THE UNITED STATES | : | **Filed Under Seal Pursuant to** |
| OF AMERICA, | : | **31 U.S.C. § 3730(b)(2)** |
| | : | |
| Plaintiffs and Relator, | : | **DO NOT SERVE** |
| | : | |
| | : | **DO NOT PUT ON PACER** |
| v. | : | |
| | : | |
| | : | |
| EDUCATION AFFILIATES, INC., | : | |
| d/b/a Fortis College, Fortis Institute, All- | : | |
| State Career, Driveco CDL Learning | : | |
| Center, Denver School of Nursing, and | : | |
| Saint Paul's School of Nursing | : | |
| | | |
| Defendant. | | |

**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

## I.    INTRODUCTION

1.    *Qui tam* relator McArthur, Gruff & Associates LLC by its counsel Morgan Verkamp LLC brings this action on behalf of the United States against Defendant Education Affiliates, Inc. to recover damages and civil penalties under the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA").

2.    Defendant operates for-profit colleges nationwide that purport to provide education and training for, among others, prospective nurses. However, Defendant's schools are educational

1

in name only. Defendant does not provide the students what they bargained for upon enrollment, nor does it provide what the federal government bargained for upon payment in the form of student aid. Instead, Defendant collects federal money for classes it does not provide, on behalf of students it knows to be ineligible, and it falsifies grade and attendance records to conceal its fraud. Under its scheme, where maximizing federal revenue generated by student aid is the sole benchmark, few students graduate, become licensed, and find employment in their field. Rather, Defendant exploits students for their federal aid, and most students leave before graduation, with staggering federal debt that they are unprepared and unable to repay.

3.      Defendant targets vulnerable populations with modest resources for whom traditional educational paths have been of reach. As reflected in the entrance exams taken by prospective students, Defendant focuses on prospective students who are unable to pass reading comprehension, vocabulary, and math tests designed to assess college readiness. In order to meet its budgeted quota of students and begin collecting the revenue generated by their financial aid, Defendant manipulates or ignores its own admissions policies.

4.      Although it charges more for its programs than, for example, community colleges, Defendant does not provide the support services or the level of education that non-profit and public institutions provide. Rather, its focus is on recruiting, not career services. For example, recruiting staff outnumber career services staff five to one at Fortis College in Cincinnati, one of Defendant's schools.

5.      Nor does Defendant provide the educational services for which it is paid and for which students go into deep debt. Instead, in blatant violation of the regulations governing federal student aid, Defendant provides a revolving door of unqualified faculty, classes without

instructors, clinical sites that are unsafe and/or completely unrelated to the course objectives, labs without proper equipment, and instruction that leaves students unprepared for licensure exams.

6.      As a result of Defendant's fraudulent scheme and its false representations of Title IV eligibility, countless students—already financially vulnerable—have been left with tens of thousands of dollars in public debt they have no hope of repaying and without the credentials or career they bargained for. In contrast, Defendant receives millions of dollars of federal financial aid each year, on account of these students, which it would not receive but for its conduct. Thus, both the taxpayers and hopeful students fund Defendant's fraud.

## II.      JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1331.

8.      Defendant transacts business and is found in this District, and many of the facts forming the basis of this complaint occurred within the District, making venue proper here and vesting the Court with personal jurisdiction over Defendant. 28 U.S.C. § 1391; 31 U.S.C. § 3732(a).

9.      The facts and circumstances of the False Claims Act violations alleged herein have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or government accounting office report, hearing, audit, or investigation, or in the news media.

10.     Relator is an original source of the information upon which this Complaint is based, as that term is used in the FCA, 31 U.S.C. § 3730(e)(4)(B).

11.     Relator disclosed the allegations of this complaint to the United States prior to its filing.

### III.    PARTIES

12.    The real party in interest to the claims set forth herein is the United States of America.

13.    Relator McArthur, Gruff & Associates, LLC is a limited liability company formed under the laws of Wyoming for the purposes of bringing this action.

14.    Defendant Education Affiliates, Inc. is headquartered in Baltimore, Maryland. It is a privately held corporation with approximately 50 schools and colleges in at least 17 states: Alabama, Arizona, Colorado, Florida, Georgia, Indiana, Louisiana, Maryland, New Jersey, New York, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Utah, and Virginia. Education Affiliates was formed in 2004 by JLL Partners, a New York-based private equity fund as an investment vehicle focused on generating revenue in the post-secondary education industry.

### IV.    FED. R. CIV.P. 9(b) ALLEGATIONS

15.    Some of the factual information necessary to prove the allegations set out in this Complaint is exclusively in the possession of Defendant or the United States.

16.    Relator knows that claims for funding for educational services under Title IV and other federal funding sources are submitted or caused to be submitted by Defendant to the United States.

17.    Each allegation made on information and belief identifies a situation in which Relator has a reasoned factual basis to make the allegation but lacks complete details.

### V.    LEGAL & REGULATORY BACKGROUND

18.    From at least 2007 through the present, Defendant knowingly submitted and/or caused the submission of false claims for payment to the United States Department of Education

4

in the form of Free Applications for Federal Student Aid ("FAFSA") and the resulting drawdowns of Title IV funds related to each approved FAFSA. Those claims were false because Defendant:

- knowingly makes false statements and promises in its Program Participation Agreements and in certifications accompanying its drawdowns of federal financial aid that it was complying with, and would continue to comply with, applicable laws and regulations governing the award of Title IV funds;

- fraudulently maintains the required approval from state Boards of Nursing by making false statements and misrepresentations to the Boards of Nursing about its courses, faculty, and students; and

- makes or causes to be made false representations in grant and loan applications that the students seeking federal financial aid were eligible to receive such aid.

### A. The False Claims Act

19. The False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (B) (the "FCA"), imposes liability upon, *inter alia*, those who knowingly present or cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to a false claim. Violators are liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages sustained by the government. 31 U.S.C. § 3729(a)(1).

20. The FCA defines "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

21.     The FCA defines "knowing" and "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1).

### B.     Title IV of the Higher Education Act of 1965

22.     Title IV of the Higher Education Act of 1965 (the "HEA") authorized the United States to fund certain federal student loan and grant programs. 20 U.S.C. § § 1070 *et seq*.

23.     Title IV funding takes many forms, including Pell Grants and subsidized and unsubsidized loans guaranteed by the United States through the Federal Direct Loan Program.

24.     The programs are administered by the United States Department of Education and provide students with financial assistance for their post-secondary education.

25.     The Department of Education differentiates between institutional eligibility and student eligibility for federal funds. To participate in the Title IV programs and receive federal funding, institutions like Defendant must both establish institutional and program eligibility and then ensure student eligibility before disbursing such funds. Defendant's fraud relates to both institutional and student eligibility to receive Title IV funds.

### 1.     Federal Regulations Governing Title IV Funding

26.     Schools that receive Title IV funds must comply with certain federal requirements. For example, a school must be accredited and licensed to operate in each state in which it does business. 20 U.S.C. § 1001; 20 U.S.C. 1094; 34 C.F.R. § 600.5(a)(4) & (6).

27.     Institutions that receive Title IV funds are prohibited from making substantial misrepresentations about, among other things, the nature of the institution's educational programs or the employability of its graduates and the institution's educational program including, but not

limited to, the source, nature and extent of its accreditation; the transferability of course credits; and the nature of its financial charges. 34 C.F.R. §§ 668.72 & 668.74.

28.     A misrepresentation consists of "any false, erroneous or misleading statement" that an institution made directly or indirectly to a student, a prospective student, or any member of the public, and a substantial misrepresentation includes "any misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment." 34 C.F.R. § 668.71.

29.     An institution may only receive and retain Title IV funds that each student earns in compliance with applicable federal statutes and regulations and the institution's Program Participation Agreement. When a student withdraws—or is withdrawn—without completing a program of instruction, the school must calculate the amount of Title IV funds that it can permissibly retain as "earned" funds.  It must then refund within 45 days to the Department of Education and the student any "unearned" funds. 34 C.F.R. § 668.22.

30.     Only "eligible" students may receive federal Title IV aid. 20 U.S.C. § 1091; 34 C.F.R. Part 668. To be "eligible," a student must meet the requirements of 34 C.F.R. § 668.32. These include, among others, that the student be enrolled or accepted for enrollment in an eligible program at an eligible institution and maintain "Satisfactory Academic Progress" in his or her course of study according to the school's published standards and in accordance with federal guidelines. 20 U.S.C. § 1091 (a)(2); 34 C.F.R. §§ 668.32 & 668.34.

### 2. Program Participation Agreements

31.     All post-secondary institutions must enter into a Program Participation Agreement ("PPA") with the Department of Education as a condition of eligibility to receive payment of Title IV funds or to have its students receive such funds. 20 U.S.C. § 1094; 34 C.F.R. § 668.14. Initial

and continued Title IV payments are conditioned upon compliance with the provisions of the PPA regulations, the individual program regulations, and any additional conditions specified in the PPA that the Department of Education requires be met. 34 C.F.R. § 668.14(a)(1).

32.     By signing a PPA, an educational institution agrees that its receipt of payment of Title IV funds is subject to the terms and conditions set forth in the PPA.

33.     Each PPA expressly conditions a school's initial and continuing eligibility to receive payment under Title IV on compliance with specific statutory requirements that include the proper determination of student eligibility for these funds and compliance with all institutional eligibility requirements, such as those set forth herein.

34.     When an institution enters into a PPA, it accepts that it has a fiduciary responsibility to the Department of Education by virtue of being entrusted to disburse federal funds to eligible students on behalf of the federal government. As fiduciaries in the administration of the Title IV programs, Defendant is held to the highest standard of care in administering the programs and in accounting to the Department of Education for any funds disbursed under the programs. 34 C.F.R. § 668.82. One aspect of that obligation is that Defendant must ensure that the expenditure of Title IV funds is proper and in compliance with program requirements. 34 C.F.R. § 668.116(d).

35.     The Department of Education has the authority to revoke or terminate an institution's PPA if it is found to have engaged in substantial misrepresentation. 34 C.F.R. §§ 668.13(d); 668.86(a)(1)(ii)(A).

### 3. Claims for Payment Under Title IV

36.     After a school becomes eligible to receive Title IV funding by entering into a PPA, claims for payment of those funds can be made in various ways. Under the Pell Grant Program ("Pell") and the Federal Direct Loan Program ("FDLP"), for example, students submit requests

for funding directly to the Department of Education, or to the Department of Education with the assistance of schools. Under the Federal Family Education Loan Program ("FFELP"), students and schools jointly submit requests to private lenders for loans that are then guaranteed by state agencies and are, in turn, insured by the Department of Education and paid in the event of a default.

37.     The disbursement of Title IV funds rests on required statements of eligibility. In order to be paid with Title IV funds, Defendant is required by statute, regulation, and accreditation standards to provide a statement that certifies the student's eligibility to receive a loan under Title IV. *E.g*., 20 U.S.C. 1087d (a)(1)(C).

38.     For all Title IV programs, students who seek federal funding must complete a Free Application for Federal Student Aid ("FAFSA").

39.     The Pell Grant program provides federal funds to assist postsecondary school students in financial need, 20 U.S.C. § 1070a; 34 C.F.R. § 690.1. The student initiates the process by submitting a FAFSA to the Department of Education to have her expected family contribution ("EFC") calculated in order to receive an accurate amount of Pell funds. 34 C.F.R. § 690.12(a). The student either sends the FAFSA directly to the Department of Education or provides it to a school for the school to transmit to the Department of Education on the student's behalf. 34 C.F.R. § 690.12(b).

40.     The Department of Education sends the student's application information and EFC to the student on a Student Aid Report ("SAR") and sends each school the student has designated an Institutional Student Information Record ("ISIR") for that student. 34 C.F.R. § 609.13.

41.     The school uses this information to calculate the student's eligibility for all aid and to assemble a "financial aid award package" for the student borrower. The financial aid award package may include Pell Grants, FDLP Direct Loans, or Campus-Based Aid (which, in turn,

includes Federal Supplemental Educational Opportunity Grants, Federal Work-Study, and Federal Perkins Loans), as well as other scholarships or aid for which the student may be eligible.

42.     The student can accept all or part of the financial aid award package.

43.     If the student accepts a Pell Grant, an FDLP Direct Loan (for which the Department of Education is both lender and guarantor), or both a Pell Grant and a Direct Loan, the school creates an electronic "origination" record that the school submits to a Department of Education computerized database called "COD," the Common Origination and Disbursement system. The origination record includes student demographic data, the award or payment period, the award amount, and disbursement dates and amounts. The COD database, in turn, links the information in the origination record to another Department of Education database, called "CPS," the Central Processing System, which compares the information in the origination record to the information on the student's SAR and ISIR.

44.     Provided that the information submitted by the school is consistent with the information possessed by the Department of Education, the Department of Education makes funds available for the school to electronically draw down from a computerized system known as "G5."

45.     Schools must electronically certify in G5 prior to drawing down the funds that "by processing this payment request . . . the funds are being expended within three business days of receipt for the purpose and condition[s] of the [Program Participation] agreement."[1]

46.     Under the FFELP, which includes subsidized and un-subsidized Stafford Loans, a guaranty agency makes the eventual claim for payment by the United States.[2] If a student defaults

---

[1] In addition to the Pell Grants themselves, the Department of Education also pays to the school an annual administrative cost allowance of $5.00 for each student who receives a Pell Grant, to be used to pay the costs of administering the Pell Grant and other Title IV aid programs. 20 U.S.C. § 1096; 34 C.F.R. § 690.10.
[2] No new loans were made under FFELP after July 1, 2010. Prior to that date, the school and student submitted an application to a private lender for a loan on behalf of the student.

in repaying a loan under the FFELP program, a state or private guaranty agency reimburses the lender or subsequent holder of the loan for the outstanding balance and takes assignment of the loan for collection action. 34 C.F.R. § 682.401(b)(14). If the guaranty agency is unable to collect from the borrower, the Department of Education reimburses the guaranty agency for the loss it incurred in honoring the defaulted claims, 20 U.S.C. § 1078(c)(1)(A), and the Department of Education may, in its discretion, take assignment of the loan. 20 U.S.C. § 1078(c)(8). In this way, the government is ultimately called upon to satisfy claims for payment.

47. In order to participate in the FFELP or any other Title IV loan program, as opposed to a grant program, a student completes a Master Promissory Note ("MPN") and submits the MPN to the educational institution. The institution, in turn, completes a "School Certification," in which it certifies the accuracy of the information it provided to the Department of Education and the student's eligibility for the loan. 34 C.F.R. § 682.102. While the MPN itself is valid for ten years, the educational institution determines the student's ongoing eligibility for aid and completes the School Certification annually.

48. Under the FFELP, the educational institution submits the MPN to the lender. Upon approval by the lender, the lender obtains a loan guarantee from a guarantee agency. 34 C.F.R. § 682.102. The loan is made in reliance upon the accuracy of the information provided by the educational institution.

49. The lender transfers the FFELP funds directly into the educational institution's account. Upon receiving the FFELP funds, the educational institution credits a student's account for education-related expenses, such as tuition, fees, books, and supplies.

50.     For subsidized Stafford Loans, the government pays the interest on the student's behalf during the time the student is enrolled in school on at least a half-time basis, and during the student's grace period before repayment commences. 34 C.F.R. § 682.102(d)(2).

51.     In the event of default on the loan, the Department of Education pays to the guarantee agency all or part of the unpaid principal and accrued interest, as well as a variety of administrative costs. 34 C.F.R. § 682.404.

### C.      Defendant's Participation in Federal Aid Programs

52.     On information and belief, Defendant has, since at least 2006, annually signed and submitted PPAs to the Department of Education.

53.     The PPAs signed by Defendant state, as do all PPAs, that the execution of the PPA by Defendant and the Secretary of Education is a prerequisite to Defendant's initial and continued participation in any Title IV program, and they condition receipt of Title IV funds on Defendant's compliance with federal laws and regulations. 34 C.F.R. § 668.14.

54.     By signing the PPAs, Defendant certified that it would comply with Title IV of the HEA and all applicable regulations implemented under its authority. All of the PPAs signed by Defendant state that Defendant understands and agrees that it is subject to and will comply with the program statutes and implementing regulations for institutional eligibility as set forth in 34 C.F.R. Part 600 and for each Title IV program in which it participates, as well as the general provisions set forth in Part F and Part G of Title IV of the HEA, and the Student Assistance General Provisions regulations set forth in 34 C.F.R. Part 668.

55.     Defendant also certified in each PPA that it would comply with all statutory provisions of, or applicable to, Title IV of the HEA, all applicable regulatory provisions prescribed

under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA.

56.     Defendant also agreed in the PPAs to meet all state licensure and accreditation requirements, including all requirements established pursuant to Part H of Title IV of the HEA by the Secretary of Education, state authorizing bodies, and nationally recognized accrediting agencies, and to provide truthful and not misleading information to the accrediting agencies that accredit one or more of its campuses or programs.

57.     Each of the PPAs signed by Defendant further states that in the case of an institution that advertises job placement rates as a means of attracting students to enroll in the institution, Defendant would make available to prospective students, at or before the time that those students apply for enrollment:

> (i) the most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements; and

> (ii) relevant state licensing requirements of the state in which the institution is located for any job for which an educational program offered by the institution is designed to prepare those prospective students.

The data to be provided by Defendant was required to be truthful, and not materially misleading. 34 C.F.R. § 668.14.

58.     As described in greater detail below, Defendant knowingly made false statements, false certifications, and false claims regarding its compliance with Department of Education regulations and the terms of its PPAs. Beginning in at least 2007, Defendant violated Federal regulations by repeatedly lying to students about, among other things, the opportunities they would have as graduates of Defendant's nursing programs, in order to induce them to enroll at Defendant's schools. In order to secure greater federal funding, Defendant also enrolled and

13

maintained enrollment for students who were not eligible, and then concealed its ineligibility by fabricating documents.

59.    Defendant nevertheless executed the PPAs and certified that it would comply with applicable federal regulations and the terms of the PPAs. Defendant then drew down federal grant funds and again certified that the funds were being used in accordance with the conditions of the PPAs. Defendant's statements were false when made and caused the Department of Education to pay claims under Title IV programs that it would not have paid but for Defendant's fraud.

60.    Defendant has claimed and received substantial sums in Title IV funding from the Department of Education as a result of its fraudulent conduct described herein. For example, for the month of October 2014, Education Affiliates received a total of $35,008,326 in Title IV funds for all of its schools. Of that, $1,233,112 came from Title IV funds from Fortis College in Cincinnati.

61.    In addition, Defendant has claimed and received substantial funds from other federal programs as a result of its fraudulent conduct.

62.    All federal aid programs require similar certifications similar to those in Defendant's PPAs regarding its agreement to comply with federal laws and regulations. Among the federal programs through which Defendant offers and receives student financial aid (other than those through the Department of Education) are the Department of Veterans Affairs ("VA") GI Bill Educational Benefits and Veterans Benefits. For example, S.S. is a student in Fortis College's Associate Degree in Nursing program. In October 2014, she was approved for funding for Defendant's program from the VA's Post-9/11 GI Bill program for $15,726.90.

63.     On information and belief and at all times relevant hereto, Defendant offered and then received financial aid for veterans and dependents of veterans through various programs offered by the United States through the VA.

64.     Defendant's misrepresentations concerning its entitlement to student financial aid through these federal programs were false when made, and caused these federal programs to pay claims that they would not have paid but for Defendant's fraud.

### D.     Ohio Board of Nursing Requirements

65.     The Ohio Board of Nursing (the "Board") is the state regulatory body responsible for approving and regulating all Ohio schools of nursing, including Fortis College. If an institution like Fortis College were not approved by the Ohio Board of Nursing, the federal requirement for Title IV funding that it be licensed to operate in Ohio would not be met, and Defendant would be in violation of its PPAs and its attendant conditions of payment.

66.     The standards governing the Board's approval process are set forth in the Ohio Administrative Code, as provided by Ohio Revised Code Title 47, Chapter 4723, *et seq*.

67.     The Board is vested with significant discretionary power, and many provisions of the code allow for the Board to take action if schools fail to meet the required standards, but only a few failures trigger mandatory action. Chapter 4723-5-04 of the Ohio Administrative Code provides that the Board must place a school on provisional approval status for a period of time for, among other things, failure to provide clinical or laboratory experience to students.

68.     As part of its mandated curriculum, the Board requires that all clinical and laboratory experiences " [m]eet the established course objectives or outcomes; [p]rovide a nursing student with the opportunity to practice cognitive, psychomotor, and affective skills in the performance of a variety of nursing functions with individuals or groups across the life span;

[p]rovide a nursing student with the opportunity to practice technical skills including skills pertaining to intravenous therapy; [and a]re provided concurrently with the related theory instruction." O.A.C. chs. 4723-5-13 & 4723-5-14.

69.     Other curriculum requirements include that the "curriculum shall be…implemented as written." O.A.C. chs. 4723-5-13 & 4723-5-14.

70.     Among other things, the program administrator for a school approved by the Board has the "authority, accountability, and responsibility for…implementing an orientation process for new faculty," and "[c]ertifying to the board…for each student who is an applicant for licensure in Ohio that each applicant successfully completed the requirements of a [nursing] program." O.A.C. ch. 4723-5-06.

71.     Chapter 4723-5-25 of the Ohio Administrative Code provides that any program subject to the Board's regulations "shall not make any false, misleading, or deceptive statements, or submit or cause to be submitted any false, misleading or deceptive information or documentation to the board or any representative of the board. Violation of this requirement shall be considered a failure to meet the requirements of this chapter in considering approval status."

### E.     ABHES Requirements

72.     The Secretary of Education of the United States Department of Education recognizes the Accrediting Bureau of Health Education Schools ("ABHES") to accredit private postsecondary institutions that are predominately engaged in health education. Fortis College in Cincinnati is accredited by ABHES.

73.     Like all accrediting bodies, ABHES imposes a host of requirements on the institutions it accredits, including detailed financial, structural, and curricular requirements.

74.    Some of these requirements include: compliance with the "written and published institutional Satisfactory Academic Progress Policy;" allocation of resources sufficient to support the curriculum, including necessary equipment and teaching resources, including qualified, seasoned faculty; "a strong teaching and learning environment in the educational setting including classroom, laboratory and clinical components;" and having clinical experiences to meet the goals and objectives of the programs of study.

75.    ABHES also requires that clinical experiences be "available for all enrolled students as they progress to that portion of the program…[such that] [s]tudents do not wait for sites and back-up sites are available to ensure that the educational process is continuous."

76.    ABHES's standards of Satisfactory Academic Progress[3] notes that "[i]nstitutions who participate in Federal Title IV financial assistance programs must comply with the regulations specified by the U.S. Department of Education for student eligibility. The Commission has determined that the institutional policy, which applies to all students, must include the following requirements," which "must be strictly observed":

> •    An institution has written standards of satisfactory academic progress for all students published in appropriate institutional literature, and (b) these standards are consistently applied to all students within categories of students and academic programs as established by an institution, regardless of financial aid status. An institution may maintain separate standards for academic quality and attendance requirements, but standards must be applied to all students equally.
> •    An institution's policies define the effect on satisfactory progress of course withdrawals, incomplete grades, repeated courses, transfer credits, proficiency credits, non-credit courses, remedial courses, or non-punitive (pass/fail) grades.

77.    To maintain accreditation, institutions and programs must complete annual reports, in which, inter alia, they must demonstrate at least a 70 percent retention rate for each program, a

---

[3] http://www.abhes.org/assets/uploads/files/17th_Edition_Accreditation_Manual_2-11-2014.pdf

70 percent placement rate for each program, and a 70 percent pass rate on mandatory licensing and credentialing examinations. Accreditation may be withdrawn at any time if an institution or program fails to comply with these 70-percent standards.

78.     Indeed, ABHES accreditation may be withdrawn, *inter alia*, when an institution fails to comply with *any* accreditation standard. Failure of an institution to maintain compliance with all requirements of Title IV can result in a directive to the institution to show cause why accreditation should not be withdrawn.

### VI.     DEFENDANT'S FRAUDULENT SCHEME

#### A.     Background

79.     Defendant Education Affiliates is a privately owned company that owns and operates over fifty for-profit colleges that issue certificates, diplomas, and degrees in a variety of fields, including All-State Career in Pennsylvania and Maryland (offering, among others, commercial driving and allied health training); Driveco CDL Learning Center in Indiana (commercial driving); Denver School of Nursing in Colorado; Fortis Institute and Fortis College, in Alabama, Georgia, Ohio, Tennessee, South Carolina, Pennsylvania, Texas, Indiana, Florida, New Jersey, Virginia, Arizona, and Utah (medical assisting, nursing, among others); and Saint Paul's School of Nursing, in New York (nursing, dental and medical assisting).

80.     Education Affiliates, through the fictitious name "Fortis College," offers diploma programs in Heating, Ventilation, Air Conditioning and Refrigeration; Medical Assisting; Medical Billing and Coding; Medical Office Basic X-Ray Technician; Welding Technology; and Practical Nursing in Cincinnati, Ohio. It also offers a degree of Associate of Applied Science in Nursing.

81.     Defendant Education Affiliates oversees and provides direction and management to Fortis College through (i) Regional Dean of Nursing Terri Harville, who is based in Centerville,

18

Ohio and is responsible for oversight of all Education Affiliates' nursing programs in at least Ohio and Florida; (ii) Regional Vice President Eric Jacobs, based in Piscataway, New Jersey; and (iii) Vice President for Nursing Robert Anders, based in El Paso, Texas. Jacobs and Anders report directly to Duncan Anderson, the President of Defendant Education Affiliates, based in Baltimore, Maryland.

82.      The leadership at Fortis College includes President William McGuire and Director of Nursing Lois Stotter, based in Cincinnati, Ohio.

83.      Benefits and payroll for employees of Fortis College are managed and distributed by Defendant Education Affiliates.

84.      Defendant Education Affiliates has instituted many uniform policies and procedures throughout its colleges. For example, the catalog for Fortis College is the same catalog used by Education Affiliates' other schools, to include, without limitation, Fortis Institute in Nashville, TN; Fortis College in Westerville, OH; Fortis Institute in Pensacola, FL; Fortis Institute in Miami, FL; Fortis Institute in Houston, TX; Fortis College in Norfolk, VA; Fortis College in Smyrna, GA; Fortis Institute in Lawrenceville, NJ; Fortis College in Salt Lake City, UT; and Fortis College in Centerville, OH. Those catalogs set forth, among other things, academic, admissions, and attendance requirements.

85.      Fortis College offers a one-year diploma program in Practical Nursing and a two-year Associate degree program in Nursing. On information and belief, nearly 100% of the nursing students enrolled at Fortis College receive some form of federal financial aid. This aid takes the form of Title IV funding via Pell Grants and federal direct loans, as well as student aid distributed via the VA to veterans of the Armed Services.

86.    To graduate from either program, students must complete the required coursework, in the prescribed order set out in the school's catalog and approved by the Board of Nursing and relevant accrediting body, and they must do so successfully. This means, among other things, that students must achieve final grades in nursing and core science classes[4] of at least C+ and at least C- in all other courses.

87.    Attendance can affect students' grades and, ultimately, graduation. According to Defendant's catalog, a nursing student who has two absences in any lecture, lab or clinical will be placed on attendance probation for the remainder of the quarter. Any missed class, lab or clinical time during probation will result in the student being dropped from the course and receiving a failing grade. In addition, students must complete 100% of the scheduled clinical hours during the assigned grading period.

88.    In addition to successful completion of the prescribed, progressive course of study—to include clinical and lab hours concurrent with the didactic portion of class, tied to established course objectives or outcomes—at the end of their final quarter, every nursing student must take a comprehensive examination, called the HESI (the Health Education Systems, Inc.) exam. To graduate, they must pass the HESI at the end of their program.

89.    In order to actually become employed as a nurse, graduates from either program must sit for a licensure exam, called the NCLEX (the National Council Licensure Examination), administered by the National Council of State Boards of Nursing. A correlation exists between exit HESI exams and likelihood of success in the NCLEX, the exam required for licensure. One study showed that the HESI exam was 98.46% accurate in predicting NCLEX success.[5]

---

[4] As set forth in Defendant's catalogs, the classes considered to be core science are Anatomy and Physiology, Microbiology, Nutrition, and General Biology.
[5] http://www.nursingcenter.com/lnc/journalarticle?Article_ID=648190

90.     Licensed graduates of the Practical Nursing program become LPNs (Licensed Practical Nurses), whereas licensed graduates of the Associate Degree program become RNs (Registered Nurses). Increasingly, LPNs are not being hired by hospitals, which are typically requiring at least a two-year degree but often a four-year baccalaureate degree in nursing. Instead, when LPNs find work, it is typically in a nursing home or other long-term or home-health care setting.

91.     Approximately sixty students begin in Fortis College's two nursing programs each quarter. However, less than one-quarter of those who start actually graduate and sit for the NCLEX. Of those, only 60% on average pass the NCLEX and become licensed. For example, the cumulative pass rate for January-September 2014 was 64.7%, with 17 students having taken the test, 6 having failed. The rate ending December 2013 was 53.66%. This is significantly below the national rate, which is between 80-84%.[6]

92.     As reflected in the 2014-15 catalog, tuition for the Practical Nursing program was $18,000, while total cost to the student (including lab kit, licensing exam prep and fees, drug screen, immunizations, etc.) was $23,257. For the Associate Degree program, tuition was $41,976, with a total cost to the student of $47,333.

93.     The fraudulent schemes detailed herein are reflective of the policies employed by Defendant Education Affiliates' across its empire. Defendant routinely produces students unable to successfully become licensed in their fields. For example, for the first three quarters of 2014, across all of Education Affiliates' campuses, failure rates were reported for eight out of the twelve specialty HESI exams, passage of which is necessary for graduation. The failures included, among

---

[6] Nationally, first-time NCLEX takers in 2013 who were educated in the United States had an 81.43% pass rate for Associate Degree RN candidates and an 84.63% for diploma LPN candidates. For January-September 2014, the national rates were 80.71% and 83.27%, respectively.

others, Fundamentals, Health Assessment, Pediatrics, and Pharmacology. Both the Regional Vice President and the Regional Dean of Nursing have referenced similar problems in Defendant's schools beyond Cincinnati.

94. On information and belief, the practices detailed herein that have led and continue to lead to the submission of false claims are employed throughout Defendant Education Affiliates' colleges.

## B. Defendant's Material Violations of the Terms of its Agreement with the United States.

95. Each time Defendant signed a PPA from 2007 to the present and each time it drew down federal grant monies, it certified that it was complying with and would continue to comply with the federal regulations governing the award of federal funding, including the requirements that it would maintain its accreditation and state licensures, not make substantial misrepresentations, and award federal funds only to eligible students. These certifications, and Defendant's compliance, were material to the Department of Education's payment. In short, if Defendant had not complied, it would not have been paid. 34 C.F.R. 668.14.

96. As demonstrated below, Education Affiliates' certifications were false when made. Education Affiliates provides sham educational services to students in order to collect the students' financial aid. In violation of Department of Education regulations and conditions of payment for Title IV funding, Education Affiliates fails to provide the instruction (to include class, clinical and laboratory time) its students pay for with federal money.

97. In addition to collecting money for courses that simply don't happen, Education Affiliates alters grades and attendance records in order to conceal its students' ineligibility for federal aid and falsely inflate its retention rates. Students who should be academically withdrawn

are instead permitted to continue with their studies, with no hope of graduating and becoming licensed.

98.     Further, Defendant targets students who are academically unprepared and unqualified but who will likely qualify for federal aid; manipulates admissions policies in order to admit them to meet its budgeted student quota; and fails to employ qualified instructors.

1.     **Defendant knowingly fails to provide the instruction its students pay for with federal funds.**

99.     Defendant fails to employ sufficient qualified classroom instructors and fails to contract with adequate clinical sites to provide the classes its students pay for with federal funds. It thus enrolls students for classes for which it knows it has no instructor and collects money for clinical experiences that either never happen or are worthless.

100.     When it does hire instructors, they are often inexperienced and unqualified, and Defendant does not provide them the requisite training to provide its students with the education they have paid for with federal money.

101.     For example, K. Hoetker was hired in 2014 to teach, among other things, Mental Health Nursing. She was hired several weeks into the quarter, so those students who had enrolled in—and paid for—Mental Health for the September-December 2014 quarter had not had any instruction for the first five weeks of the quarter. Defendant's solution was to compress the class into weeks 7-12, with instruction 4-5 hours per day, on top of already-full daily student schedules. K. Hoetker has no background at all in Mental Health; rather, she is a trained Orthopedics and Emergency nursing. She was told she would be teaching Mental Health the day before the class was to meet. The students walked out of that class.

102.     Defendant is required by the Board of Nursing to provide clinical experiences to its students. "'Clinical experience' means an activity planned to meet course objectives or outcomes

and to provide a nursing student with the opportunity to practice cognitive, psychomotor, and affective skills in the supervised delivery of nursing care to an individual or group of individuals who require nursing care." O.A.C. ch. 4723-5.

103. Defendant sells itself to prospective students touting its many hands-on experiences.

104. However, when Defendant provides clinical experiences, they are often improper, unsafe, and worthless.

105. All clinical time for Fortis's July-September 2014 quarter Maternal-Newborn class, for example, took place at a daycare. Not only did the students not actually perform clinical learning at that site, it was a site completely untethered from obstetrics and neonates, the didactic portion of the class, in violation of the requirements of both the Board of Nursing and ABHES. Since at least 2012, no appropriate clinical site for Maternal-Newborn Health has been provided to Defendant's students; instead, Defendant sent students in those classes to daycare sites.

106. Meanwhile, the students for the July-September 2014 Medical Surgical Nursing clinical had to be removed from their placement at a Cincinnati nursing home because the site was deemed by instructor M. Shaker Badr to be unsafe both for the students and for her continued licensure. When she informed Defendant—including Education Affiliates' Vice President Jacobs—about the need for a safe site, a safe replacement site was not secured.

107. Even when the clinical is scheduled to occur in an appropriate, safe site, the students do not receive the required and advertised experiential learning. For example, students in their capstone final quarter of 2014 were sent to Forest Hills Nursing Home. However, they were not permitted by the site to do anything other than pass ice water to the residents, take vitals, and occasionally perform finger sticks for glucose analysis. Despite the lack of actual clinical learning

opportunities, Defendant charged students (and thus the Government) for this class and falsely represent that this clinical experience satisfies the Board of Nursing requirements for nursing school curricula. Having received worthless clinical training, those students are entirely unprepared to perform basic nursing functions.

108.    Similarly, Defendant sells its programs to prospective students by describing the many hands-on experiences the students will receive and heavily markets its "Human Patient Simulator." However, Defendant has not provided such high-fidelity nursing simulation at Fortis College since at least June 2014, and students are routinely simply sent to the library because Defendant does not provide a lab instructor. Students are nonetheless charged for labs and simulation not provided.

109.    The lack of clinical and lab time is so pervasive and Defendant's efforts to address the issue so minimal that Defendant's students have noted the impact of this omission on their studies and on their finances. For example, on September 22, 2014, Practical Nursing student A.C. complained to Defendant that she had not been provided all of the hours of education she paid for, noting that her Pediatrics instructor cancelled three lecture classes and Defendant provided a substitute for only one of those classes. She further noted that Defendant had not provided her with the required 30 hours of lab time for either her Pediatrics class or her Medical Surgical lab class. In response to this concern, Defendant's Director of Nursing simply said that the Board of Nursing only cares about clinical time, and the student will have completed sufficient clinical hours by the end of the quarter.

110.    Another student, T.T., made similar complaints on September 30, 2014, noting that she was receiving financial aid to pay for a "quality education in a good reputable program," which

she felt she was not receiving. T.T. further noted that she was required to repeat—and pay for—a course after her instructor was fired part-way through her first quarter.

111.    Students C.Mo. and L.Cr. eloquently expressed their concerns and dissatisfaction in letters to Defendant's administrators, noting, *inter alia*, that their Foundations in Community Nursing class for the September-December 2014 quarter had received only 3 lectures six weeks into the quarter because of Defendant's failure to provide instructors. C.Mo. said, "I feel that it is the schools [sic] duty to see that we have an instructor for the course and that the instructors be prepared to teach the class." L.Cr. said, "[I]t's not me failing this class; this class is failing me!" She noted that her entire course of study has been riddled with obstacles created by Defendant, that she's had to pay extra money, take on extra hours, and continually rearrange her life to accommodate Defendant's scheduling errors, only to show up to class and, week after week, not have an instructor.

112.    Other students have expressed similar concerns regarding the lack of available, trained, and prepared instructors. On September 30, 2014, S.M. noted that it was unfair to her to not have a teacher for her scheduled classes, saying "I am here to learn."

113.    Many students have observed that Defendant's instructors, when they show up, are often unfamiliar with the subjects they are expected to teach. For example, one student from the Practical Nursing 2014 program noted that her Obstetrics instructor was a nurse whose entire 30-year career had been in Medical-Surgical nursing.

114.    Defendant not only hires instructors to teach outside their area of knowledge, it employs instructors to teach outside the bounds circumscribed by the Board of Nursing, which requires that all faculty teaching a nursing course to those in Practical Nursing programs minimally hold a baccalaureate degree in nursing. O.A.C. Ch. 4723-5-11. However, since at least November

2007, M. McClain has been providing theory instruction to Defendant's Practical Nursing students, including teaching the class Pharmacotherapeutics I in 2012, Basic Skills, Quality and Safety in Nursing Practice in 2014, and others. M. McClain does not have a baccalaureate degree. Rather, she holds a diploma in nursing.

115.    Similarly, all faculty teaching a nursing course to those in Associate Degree programs must minimally hold a master's degree. O.A.C. Ch. 4723-5-10. In contravention of this requirement, S. Yob has since 2011 taught Maternal-Newborn Nursing to Defendant's Associate Degree students despite the fact that she herself only holds a baccalaureate degree. Similarly, K. Getz was hired in 2014 to teach Medical-Surgical Nursing to Fortis Associate Degree students, despite only having a baccalaureate degree. Defendant has concealed these violations from the Board of Nursing, ABHES, and the federal government for years.

116.    Defendant's faculty retention rate is historically abysmal, resulting in students routinely being told that they do not have instructors for classes for which the students (and, thus, the federal government) have already paid. When new faculty are brought in, they are never given orientation or training as mandated by ABHES, which requires that all faculty "[r]eceive training in educational methods, testing and evaluation and evidence strength in instructional methodology, delivery and techniques as indicated by evaluation by supervisory personnel within 30 days of beginning instruction." New faculty members report having no training at all, let alone any evaluation within the prescribed 30 days.

117.    However, when students appear close to dropping out of their own accord, rather than provide consistent, focused, thorough, appropriate and effective instruction, with required lab and clinical experiences, and prepared and qualified faculty, Defendant instead reminds faculty that the most important thing they are teaching students is not to quit, and that if students are

unmotivated, they should be reconnected with someone from admissions in order to have their fire rekindled.

118. In violation of the requirement that it return federal funds to which it is not entitled, Defendant retains overpayments, whether that be money it has appropriated for ineligible students or for classes not actually provided. For example, as discussed in paragraph 100, Defendant enrolled students in Fortis' September-December 2014 Mental Health class knowing that it had no instructor. After the students complained about Defendant compressing an entire quarter of instruction to weeks 7-12 and providing an instructor with no knowledge of Mental Health nursing, Fortis's President canceled the class in week 7 of the quarter. However, rather than refund the funds allocated to that class to the Department of Education as it was required to do, Defendant retained the funds, saying it will apply the funds when the students actually do take the class.

### 2. Defendant falsifies grades, attendance rosters, and student identification numbers.

119. In violation of federal regulations conditioning payment of student aid funds on truthfulness, and in violation of federal laws prohibiting the use of fraud, false statements and forgery to obtain Title IV funds, Defendant alters grades and attendance records of its students. O.A.C. ch. 4723-5-25; 34 C.F.R. § 668.14; 20 U.S.C. § 1097(a).

120. Pursuant to Defendant's own policies, for a student to successfully pass a class in either nursing program, he must achieve at least a C+, or 78%, as a final grade. The grade must be based solely on tests and quizzes, not homework or other factors. This is thus the objective measurement of Satisfactory Academic Progress as defined by federal law. C.F.R. §§ 668.32 & 668.34. To conceal the fact that its students do not actually achieve Satisfactory Academic Progress, Defendant falsifies attendance, grade, and identification records.

121.    For example, Associate Degree students S.J. and A.D. each received a C, and D.B. received a C-, as a final grade for Pharmacology for the April-June 2014 quarter, as recorded by the instructor J. Heiskell. Defendant altered those final grades to falsely represent that the students had passed. S.J. and A.D.'s transcripts falsely show that their final grade was a B; D.B.'s transcript falsely shows a B-. On information and belief, all three students are Title IV funding recipients.

122.    Sometimes, Defendant takes steps to conceal or paper-up its grade changing. For example, on September 13, 2014, Fortis College held a graduation ceremony, at which, among others, L.C., and C.H. were graduated from the Associate Degree in Nursing program. Each of those students, along with four others who graduated that day, had a Leadership and Management class their final quarter. When the instructor calculated grades for the final exam, L.C. and C.H.'s exam grades were such that neither had a passing score for the course. Had those real grades been entered, those students would not have actually graduated, thus negatively affecting Defendant's graduation rate, among other things. To avoid this, Fortis College's Director of Nursing discarded test questions in order to reconfigure the students' grades. First, she identified ten questions that she considered to be unfair. But that wasn't enough to alter the students' final grades to passing. So, she went back and discarded an additional seven questions. When she did that, it meant that "all of the members of the class passed with the 78% or better that they needed." Those revised passing grades were entered over the instructor's protest.

123.    As an additional example, Defendant's internal audit conducted from October 14-17, 2014, showed that of the student files audited, 100% were missing some or all of their clinical evaluations. In response to these findings, Defendant instructed faculty to go back and complete those evaluations, notwithstanding that students had long since received final grades for those courses despite the missing evaluations. Defendant directed this falsification because, it noted, the

lack of clinical evaluations would be a problem should the Board of Nursing conduct an audit. On information and belief, for those instructors who were no longer employed by Defendant or for those instructors who refused to participate in Defendant's falsification scheme, the Director of Nursing simply falsified the evaluations.

124.    Defendant also permits the students themselves to conduct their own evaluations. For example, on information and belief, during 2011 and 2012, instructor K. Brandabur's students routinely graded one another's exams.

125.    And evaluations of clinical classes are often either not done at all or are completed by the student. For example, Fortis College Associate Degree in Nursing student L.H.'s clinical evaluation for the March-June 2014 quarter for the clinical component of her Medical Surgical Nursing I class was completed by the student, with every category marked "Satisfactory."

126.    Pursuant to 34 C.F.R. § 668.22(b), Defendant is obligated to track students' attendance and their corresponding eligibility to receive federal aid. However, attendance violations are problematic for Defendant in at least two ways: first, by its own policies, two or more absences can lead to a failing grade. But such failure would potentially result in the loss of federal revenues to Defendant and would adversely affect its retention rates. Second, if students are not in attendance, and thus not benefitting from the education they are using federal funds to pay for, that unused aid should be returned. So, rather than correctly capture attendance, Defendant alters those records.

127.    For example, on October 22, 2014, the instructor for GNUR101L-W5, J. Schmidt, was ill, and Fortis College did not procure a substitute instructor. The attendance roster for that class nonetheless shows every student marked present for that lab.

128.    By way of further example, on May 20, 2009, Defendant took a group of nursing students to attend a rally in Columbus, Ohio and lobby their state senator regarding a then-pending legislation that was perceived to be harmful to for-profit educational institutions like Defendant. The then-School Director, with the approval of Eric Jacobs, Education Affiliates' Regional Vice President, mandated the students' instructors to not penalize those students for failure to attend classes that day.

129.    Further, on information and belief, during the summer and fall of 2010, Defendant falsified the attendance records for the students in P. Seidel's Nutrition class by indicating that the students had attended each class for the full, required 180 minutes, when, in reality, the instructor routinely arrived late and dismissed early, depriving the students of at least 60 minutes of instruction each class.

130.    Practical Nursing student K.W. questioned Defendant on or about September 23, 2014 regarding how she and her classmates in Medical-Surgical Nursing II passed the course when they had not completed the required theory, lab, or clinical hours during the July-September 2014 quarter. Despite not having completed the required hours for any of the three components of Medical-Surgical Nursing II, K.W.'s transcript shows that she received an A- for theory and a P for each of lab and clinical. She was informed by Fortis's Director of Nursing that she shouldn't worry because the Board only cares about clinical time, and they would be fine. K.W. was also identified by Defendant's October 2014 internal audit as being impermissibly short on clinical hours for Mental Health Nursing for the April-June 2014 quarter. Despite this, her transcript shows a P for that clinical. Defendant thus created a false record for K.W. to give the false impression that she completed all of the required hours throughout her studies.

131. At the close of the July-September 2014 quarter, Fortis College Director of Nursing, the College's then-Director of Education, and its Registrar looked at the attendance rosters for the students completing the quarter. For each incomplete roster—where attendance was not recorded because there was no instructor for the class—the Director of Nursing falsified the record by marking the student present and signed off on the roster.

132. At times, Defendant creates additional student identification numbers for students whose academic failures are such that another layer of subterfuge is necessary in order to conceal those failures. For example, student P.A. began in Fortis College's Associate Degree in Nursing program in 2012. After completing her first year, she had a GPA of 3.68. She then received a C in Foundations of Nursing. She repeated the class the next quarter and received a B. She then failed her Medical-Surgical Nursing clinical and received a non-passing C in the class itself. Given the two non-passing scores in two nursing classes, and having failed the drug calculation Math test multiple times, P.A. should have been academically withdrawn from the school. Instead, Defendant allowed her to continue in the program, and permitted her to retake her Math test again, because, according to Fortis's President, "it means money from the State Train Fund." On information and belief, the "State Train Fund" refers to federal funds from the Workforce Investment Act and the American Recovery Reinvestment Act of 2009, which are funneled through the Ohio Department of Job and Family Services to displaced workers. The student was instructed by Fortis College's Director of Nursing not to tell anyone about being passed along and was assigned a second student identification number to create subterfuge regarding her record.

### 3. Defendant collects federal aid for ineligible students.

133. Defendant routinely advances failing students through its programs even when the students should have been academically withdrawn. Such students are ineligible for aid because

they do not satisfy the federal requirement that they maintain Satisfactory Academic Progress. 34 C.F.R. §§ 668.32 & 668.34. Defendant flouts that requirement in order to collect as much revenue from each student as possible, irrespective of the student's eligibility or likelihood of success.

134.    A student who has failed out of the program negatively affects Defendant's retention rate and is no longer a source of revenue for Defendant. Consequently, Defendant routinely permits students to continue in the nursing programs after the students should have been academically withdrawn.

135.    The following are examples of students on whose behalf Defendant collected and retained federal financial aid money, knowing that the student was ineligible for such funds, in violation of federal laws and regulations:

- R.A. initially failed the entrance HESI as to Math and Reading Comprehension. After tutoring and proctoring provided by Defendant's admissions staff, he was admitted to its nursing program. He then scored a C in Anatomy & Physiology II for the July-September 2014 quarter. Because a C is a non-passing score, and Anatomy & Physiology II is a core nursing class, R.A. should have been required to retake the course if he wanted to continue in the program. Instead, with Defendant's full knowledge, he enrolled in the September-December 2014 quarter in Health Assessment, for which Anatomy & Physiology II is a mandatory prerequisite. In response to concerns raised by his instructor regarding his lack of preparedness for Health Assessment, Fortis College President McGuire informed R.A. that he needn't worry about the C, that he should not say anything to anyone, and that it would be ignored. When questions continued to be asked of, *e.g*., Education Affiliates' VP Jacobs and Regional Dean Harville, Defendant opted instead to make R.A. retake the course after all. But, rather than have him withdraw from the courses for which Anatomy & Physiology II is a prerequisite and continue with his study in the proper progression, Defendant instead permitted him to finish the quarter and simply add Anatomy & Physiology II to his already-fully next quarter. Knowing that R.A. is an educationally challenged student, as evidenced by, among other things, his low reading comprehension and math scores, Defendant nonetheless opted to overload his next quarter because, as explained by Fortis's Director of Education, if they followed the rules, it would jeopardize his financial aid.

- H.A. received a C in Fundamentals of Human Nutrition, a core nursing class, in the September-December 2013 quarter. He never repeated that class. In the April-June 2014 quarter, he scored a C- in Anatomy & Physiology II, another core nursing

class. Because this was his second non-passing score in a core nursing class, he should have been academically withdrawn, as required by the Department of Education's Satisfactory Academic Progress mandate, as well as by the Board's requirements and Defendant's own stated academic policies. Instead, he enrolled in both the July-September 2014 and the September-December 2014 quarters. In addition to his non-passing scores in two core nursing classes, he has a C- in English Composition, a D in General Psychology, a D in Arts and Culture, an F in Introduction to Informatics, and an F in Sociology, with a cumulative GPA as of September 2014 of 2.13.

- H.N., a Practical Nursing student at Fortis College whose education is subsidized with Title IV funding, received a C in Anatomy & Physiology and a D in Fundamentals in Human Nutrition in the April-June 2014 quarter. Because she received non-passing scores in two core nursing classes, she should have been academically withdrawn. Instead, she continued into the next quarter, and Defendant retained Title IV funding to which it was not entitled.

- B.J. started in Defendant's Medical Assisting program in 2009 and, despite a C in Essentials of Human Anatomy and a C in Selected Topics in Clinical Procedures, she graduated in November of that year. She then began the Practical Nursing program in 2010. She got an F in Concepts of Nursing I in her first quarter of that program and retook the class the following quarter, receiving an A-. She graduated from the Practical Nursing program in 2012 and started the Associate Degree in Nursing program in 2013.

  B.J. then received a C in Health Assessment and an F in Health Assessment Lab for the July-September 2013 quarter. The following quarter, she repeated those classes and got a B+ and a P, respectively. The same quarter, she withdrew from Pharmacology. The next quarter, January-March 2013, she only took one class, Pharmacology, and received a WF (which is counted the same as an F). Because that was her second non-passing grade for a core nursing class in her Associate Degree studies, she should have been academically withdrawn. However, Defendant allowed her to proceed, and she retook Pharmacology—now for the third time—and received a B+. She then failed to attend the requisite number of classes for her Maternal-Newborn Clinical for the July-September 2014 quarter. The instructor determined that she had consequently failed the class and communicated that to the Registrar. However, B.J.'s transcript shows that she received a P for the class, and she enrolled in the September-December 2014 quarter. Over the course of her studies, B.J. will have paid Defendant approximately $85,000 and will likely not actually graduate. If she does, she will be ill-prepared and statistically unlikely to pass the NCLEX licensure exam, and will nonetheless be required to pay back tens of thousands of dollars in loans from or secured by the United States, arranged by and funneled through Defendant.

- A.F. began in Fortis College's Practical Nursing program in April 2009. She scored a C in Nutrition and a C in Concepts of Nursing for the April-July 2009 quarter,

and never repeated either course. Two non-passing scores for that quarter should have led to her academic withdrawal. Instead, she continued in the program and scored a C in Pharmacotherapeutics I in the August-November 2009 quarter. Again, she should have been academically withdrawn, and she was not. She was awarded a diploma in March 2010. She then began in Fortis College's Associate Degree in Nursing program in November 2011 but withdrew from all courses that first quarter. In September 2013, she transferred credits into the program. She scored an F for her Medical Surgical Nursing clinical, lab, and simulations, and a C for the Medical Surgical class in the July-September 2014 quarter. Despite now having received four non-passing scores during her nursing studies, A.F. enrolled in the September-December 2014 quarter to, *inter alia*, retake the Medical Surgical nursing class, lab, clinical, and simulation.

- T.G., an Associate Degree in Nursing student, received a C in Health Assessment for the July-September 2013 quarter. She passed the following quarter but withdrew from Pharmacology. She then took Pharmacology in the January-March 2014 quarter, but scored a C. With two non-passing grades in nursing classes, she should have been withdrawn. Instead, she retook Pharmacology the following quarter, passed, and continued with her program of study. When Defendant's Regional Dean of Nursing was informed of this student's ineligibility, the Dean "overrode" the failures and permitted the student to continue.

- L.L. began her studies in Fortis College's Associate Degree in Nursing program in 2012. She scored an F in Anatomy & Physiology I in the July-November 2012 quarter and a D+ in Pharmacotherapeutics II. She withdrew and then returned for the January 2013 quarter. She then scored a C- in Microbiology in the July-September 2013 quarter, which Defendant's impermissibly allowed her to retake the following quarter. Then, in the January-March 2014 quarter, she scored a D in Health Assessment, an F in the associated lab, and a D+ in Pharmacology. Given this academic record, she should have been academically withdrawn. Instead, she repeated and passed those courses the following quarter. Then, in the July-September 2014 quarter, she scored an F in Medical Surgical Nursing clinical and a D+ in Maternal-Newborn Nursing, as well as an F in the associated clinicals and lab.

136.    Ignoring academic requirements for accreditation, licensure, and federal funding and concealing such failure of compliance is not a new scheme for Defendant. Student J. M.-S. began her Practical Nursing studies in August 2007 at Fortis College. She scored a C in Nursing and Universal Needs I in the August-November quarter. She never repeated that course. Instead, she enrolled in Introduction to Anatomy & Physiology in the next quarter, and also scored a C.

Although she should have been academically withdrawn at that point for two non-passing scores in required courses, she instead continued on and graduated in November 2008.

137.    In addition to ignoring the Satisfactory Academic Progress requirements with respect to grades, Defendant blatantly disregards its policy on withdrawals. In order to maintain its accreditation, Defendant must show at least a 70 percent retention rate for each program. If it were to enforce its attendance, withdrawal and grading policies, it could not reach 70 percent. To conceal this from ABHES and thus maintain its eligibility for federal funding, Defendant does not enforce its policies and makes false and misleading statements regarding its retention rate.

138.    As stated in Defendant's catalog, "[n]ursing students are allowed only two course withdrawals…from nursing courses and/or required science courses (anatomy and physiology, microbiology, nutrition, and general biology) during the entire program." It goes on, "Withdrawing a third time…will result in academic dismissal from the nursing program."

139.    Rather than enforce the policy, which would negatively affect, *inter alia*, Defendant's retention rate and its bottom line, Defendant simply ignores the policy. For example, student A.E. began in Fortis College's Associate Degree in Nursing program in January 2013. She scored a C- and an F in Anatomy & Physiology II class and lab for the April-July 2013 quarter. She then retook each and passed. For the September-December 2013 quarter, she received a W (withdrawal) for Health Assessment and its associated lab. She then began the January-March 2014 quarter, enrolled in Microbiology, Health Assessment, and Pharmacology. She withdrew from each of those classes. Thus, having withdrawn from a total of four nursing and/or required science courses, A.E. was in violation of the policy regarding multiple withdrawals. Regardless, Defendant permitted her to enroll in the program's September-December 2014 quarter.

140.    Similarly, T.R., whose education is funded in part by money funneled through the Ohio National Guard, started in Defendant's Practical Nursing program in 2011. She scored a D+ and an F in Nursing and Universal Needs I in the August-November 2011 quarter. She retook the class and passed the following quarter. She then failed her entire course load for the July-November 2012 quarter. She got a W in the January-March 2014 quarter for Mental Health Nursing and its associated lab and clinical and, the following quarter, a W in Medical-Surgical Nursing and its associated lab and clinical. She retook each of those classes in the July-September 2014 quarter and passed.

141.    Student C.M. began her Associate Degree in Nursing in 2011. In the July-September 2013 quarter, she scored a C in Health Assessment and an F in the corresponding lab. She successfully retook them the following quarter. Then, in the July-September 2014 quarter, she scored a D+ and an F in the Transition to Practice Capstone class and clinical. As her second failure, she should have been academically withdrawn. Instead, Defendant permitted her to enroll for the September-December 2014 quarter to retake that class. Fortis College's Director of Nursing and President acknowledged that C.M.'s failure was "not entirely her fault as we did not hold up our end of the bargain with a proper instructor. We hired him late and he left early…."  C.M. informed Fortis College that she wanted to retake the class to actually learn something, to pass the specialty exam, and to pass the NCLEX on the first try. Notwithstanding its abject failure to provide this student—and all like her—adequate instruction, in response, Defendant informed C.M. that she would have to pay to retake the class again—taking it for free "wasn't going to fly."

142.    By altering, ignoring, and concealing grades in order to allow failing students to pass through sequential courses, Defendant falsely certifies its students' progress, retention, and graduation rates, resulting in material misrepresentations to the Department of Education, the state

Boards of Nursing and other state agencies, ABHES and other accrediting bodies, and prospective students. Defendant employs this scheme in order both to preserve the Government revenue stream attributable to its failing students and to avoid having to return payments it had received for the accounts of students who should have been withdrawn. Had the Government known that Defendant's students were not, in fact, making satisfactory academic progress, it would not have paid Title IV or other federal monies to Defendant on each student's behalf.

### 4. <u>Defendant recruits academically and financially challenged students and fails to follow its own admissions policies.</u>

143.    To entice students to enroll in its programs, Defendant sells prospective students a false bill of goods. For example, admissions representatives tell prospective students that Defendant's Fortis College campus has a 100% job placement rate and an 87% NCLEX passage rate. These numbers are misleading and, on information and belief, false. For example, the NCLEX cumulative pass rate for Fortis College for January-September 2014 was 64.7%.

144.    One of the academic requirements for accreditation is that the institution enroll "only students who can reasonably be expected to benefit from the instruction." Defendant ignores that requirement and admits students regardless of their academic abilities.

145.    To be admitted into the nursing programs at Fortis College, prospective students must take the HESI Admission Assessment Exam and, for the associate degree program, score at least 75% on the English and Math sections. For the practical nurse program, prospective students must score at least 70%. If a graduate of one of Defendant's practical nursing programs applies to the associate degree program, the English and Math tests are not required but, instead, she must take the HESI PN Exit Exam (an exam that assesses learning from the practical nurse program) and score at least 850.

146.    Pursuant to Defendant's written policies, these tests are to be administered with a proctor who does not report to the admissions department.

147.    In reality, prospective students are first tutored and then proctored by a staff member from the admissions department when they take their entrance HESI exams.

148.    Prospective students routinely fail to achieve passing entrance scores, but Defendant simply tutors and permits such students to retake the exams as often as necessary to achieve a suitable entrance score. For example, student R.A. took the entrance HESI test on September 21, 2013 as part of his application to Fortis College's Associate Degree in Nursing program. He failed to score a passing result in Math and Reading Comprehension. Defendant permitted him to retake the test on October 25, 2013, and he passed both of those sections. R.A. started in the Associate Degree program on January 6, 2014. As noted above, he has since struggled academically.

149.    Students are charged for the entrance HESI exam, which charge is wrapped into their bill and paid for by financial aid. For example, student S.R. was charged $60 as a HESI entrance fee and $138 for the exam itself on September 30, 2013. On October 8, 2013 she received $865 in a Pell Grant, and on November 5, 2013, she received $3134 in federal direct loans. Those monies were used, *inter alia*, to pay Fortis College for S.R.'s HESI entrance test.

150.    According to Defendant's stated policy, only students who have successfully completed all admission requirements at least one week prior to the first day of a quarter may begin classes that quarter. This policy is to ensure both that only students who are academically capable of performing satisfactorily in the programs are admitted and also to allow time for the completion of requirements specific to nursing schools. For example, immunizations and criminal background checks are necessary prerequisites for nursing programs because students will be learning skills at

39

clinical placement sites where they interact with actual patients. Those sites require that immunizations be up-to-date and that students' criminal backgrounds do not place their patients in danger. In addition, the Board of Nursing requires criminal background checks because certain criminal convictions act as a permanent bar to sitting for nurse licensure,[7] and Defendant should not admit any student who has no possibility of sitting for licensure.

151.    In reality, however, Defendant admits students up until two days before classes begin, and students routinely begin Defendant's nursing programs without having completed the required pre-admission obligations. Making matters worse, Defendant does not ensure the completion of those requirements. Instead, students continue enrolled in Defendant's programs without, for example, necessary immunizations and background checks.

152.    For example, Defendant's own internal review of eighteen student files from Fortis College, conducted October 14-17, 2014, revealed that eight of the student files did not have a valid CPR card; eight did not have all required immunizations; two did not have drug screen results; one did not have the criminal background check results; and thirteen—or 72%--showed that enrollment agreements were signed before all admissions requirements were met.

153.    Further, students report that they receive no financial aid counseling. Rather, they apply for aid online, Defendant emails documents to the students' co-signor, and the students enroll when those documents are signed.

C.  **Defendant Acts Knowingly in Violating the False Claims Act, and its Violations are Material to the Government's Decision to Pay.**

154.    At all relevant times, Defendant acted knowingly as the term is defined by the False Claims Act by, *inter alia*, knowingly enrolling students for clinical time with no appropriate clinical sites; scheduling—and collecting Government money from—students for classes without

---

[7] http://www.nursing.ohio.gov/PDFS/Discipline/CRIMINAL_HISTORY_FACT_SHEET-July_2013.pdf

40

instructors; hiring unqualified instructors; falsifying grades and attendance records; falsely marketing its programs to prospective students; failing to provide them with financial aid counseling; permitting students who should have been academically withdrawn to continue as enrolled students; and failing to return money to which it was not entitled.

155.    Notwithstanding Defendant's knowledge that its nursing programs failed in all material respects to comply with the terms of its agreement with the United States, Defendant falsely represented, and continues to represent, that it was in compliance with the terms of its agreement with the United States and governing laws and regulations, including core eligibility requirements of the state Board of Nursing and accreditation bodies. Defendant's false representations regarding these essential terms caused the United States to pay out funds to which Defendant was not entitled.

156.    In addition, Defendant repeatedly certified—and continues to certify—that it would comply with applicable federal regulations, including those relating to student and institutional eligibility. Defendant certified and certifies that the federal funds were being used for the educational purposes for which they were disbursed and in accordance with the requirements set forth in the PPAs.  Defendant's certifications were false when made and caused—and continue to cause—the United States to pay claims that it would not pay but for Defendant's fraud. If Defendant had truthfully reported to state agencies, accrediting bodies, and the federal government, it would not have been eligible to receive Title IV and other federal funding.

157.    In short, Defendant routinely and perniciously failed to comply with the core terms of its agreement with the United States, including core terms of its accreditation eligibility with the state Boards of Nursing.  Defendant's false representations regarding its compliance, including the false recording of student and class records, caused the Government to pay Defendant

significant Title IV and other federal funds. Defendant's false representations would have affected the Government's decision to pay.

158.    Defendant's scheme of providing sham, worthless education to students while collecting hundreds of millions of dollars[8] in federal aid money is, on information and belief, employed throughout its colleges, in each of the seventeen states in which Defendant operates. The business model of collecting federal student aid funds while failing to provide the promised and purchased education has been Defendant's model since at least 2007 and continues to the present.

159.    Every claim submitted to the United States for student aid for an ineligible student or for a student attending an ineligible institution constitutes a false claim in violation of the False Claims Act.

## COUNT I: VIOLATIONS OF THE FALSE CLAIMS ACT

160.    The allegations in the foregoing paragraphs are re-alleged as if fully set forth herein.

161.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), (B), and (G), imposes liability upon, *inter alia*, those who knowingly present or cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to a false claim or to an obligation to pay money to the government, or those who knowingly conceal, improperly avoid or decrease an obligation to pay money to the government.

162.    Defendant knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

---

[8] On November 26, 2008, a report to the New York state Education Department reported Defendant's assets at $264.4 million and that its schools received $105,000,000 in Title IV funds for 2007. At that time, it owned twenty schools in nine states.

163. Defendant's actions in presenting or causing to be presented false claims for payment were done knowingly as that term is defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)(i-iii), and § 3729(b)(1)(B).

164. Defendant's actions would have a natural tendency to affect the Government's payment of the resulting claims, and as such are material to payment.

165. Defendant also knowingly made, used or caused to be made or used, false records and statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).

166. In violation of 31 U.S.C. § 3729(a)(1)(B), Defendant knowingly created and used, or caused to be made or used false records and statements material to false or fraudulent claims when it falsified attendance records and grades.

167. Defendant's actions in creating and using, or causing to be made or used, false or fraudulent records and statements material to a false or fraudulent claim were done knowingly as that term is defined by the False Claims Act, 31 U.S.C.§ 3729(b)(1)(A)(i-iii), and § 3729(b)(1)(B).

168. 31 U.S.C. § 3729(a)(1)(G) imposes liability on one who (i) "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government," or (ii) "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."

169. Defendant is required to return federal funds to which it is not entitled within 45 days of the overpayment. 34 C.F.R. § 668.22. Defendant does not abide by this requirement and does not return unearned money, whether that be money it has appropriated for ineligible students or for classes not actually provided.

170. Defendant concealed its students' and its own ineligibility to Title IV and other federal funds and failed to report the same, which resulted in overpayments from the United States. Further, Defendant failed to repay obligations to the United States every time it failed to refund federal aid money allocated to a class that never actually occurred. In addition, Defendant made a false statement material to an obligation to transmit money to the Government each time it falsely certified students' eligibility, as well as with each PPA's certification regarding the institution's eligibility.

171. Defendant's ongoing and knowing failure to report and refund these overpayments violates the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

## **PRAYER FOR RELIEF**

WHEREFORE, Relator prays for judgment against Defendant as follows:

A.     That the Court enter judgment against Defendant and order that it cease and desist from violating 31 U.S.C. § 3729 *et seq*.;

B.     That the Court enter judgment against Defendant in an amount equal to three times the amount of the damages the United States Government has sustained because of Defendant's action, plus a civil penalty of not less than $5,000 and not more than $11,000 for each action in violation of 31 U.S.C. § 3729;

C.     That the Court enter judgment against Defendant for the costs of this action, with interest, including the costs to the United States for its expenses related to this action;

D.     That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

E.     That Relator be awarded all costs, attorneys' fees, and litigation expenses;

F.      That the United States Government and Relator receive all relief, both at law and in equity, to which they may reasonably appear entitled; and

G.      That Relator recover such other relief as the Court deems proper and just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Respectfully submitted,

_/s/ Jennifer M. Verkamp_____
Jennifer M. Verkamp (0067198)
Frederick M. Morgan Jr. (0027687)
MORGAN VERKAMP LLC
35 E. 7th St., Suite 600
Cincinnati, Ohio 45202
Phone: (513) 651-4400
Fax: (513) 651-4405
Email: jverkamp@morganverkamp.com
Email: rmorgan@morganverkamp.com
*Attorneys for Relator*

**DO NOT SERVE**

**DO NOT PUT ON PACER**